# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

ERIC LYNCH,

                                  Plaintiff,

       v.                                              9:20-CV-63
                                                            (BKS/ATB)

COUNTY OF HERKIMER, et al.,

                                  Defendants.

ERIC LYNCH, Plaintiff, pro se
GREGG T. JOHNSON, ESQ., for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff raises various constitutional claims related to events allegedly having occurred during his confinement as a pretrial detainee at Herkimer County Jail ("HCJ"). (Complaint ("Compl.")) (Dkt. No 2). Plaintiff filed his original complaint in New York State Supreme Court, Herkimer County. Defendants removed the action to the Northern District of New York on January 16, 2020. (Dkt. No. 1). The defendants answered the complaint through counsel, and discovery ensued. (Dkt. Nos. 6, 51).

Presently before the court is the defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 55). Plaintiff has responded in opposition to the motion (Dkt. No. 69), and defendants filed a reply (Dkt. No 72). Plaintiff filed a sur-reply, which was subsequently accepted by the court for filing. (Dkt. Nos. 79, 80).

## I.     __Summary Judgment__

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## II.    Facts

Plaintiff was remanded to the custody of the HCJ on March 9, 2017, where he remained incarcerated as a pretrial detainee at all times relevant to the underlying complaint.  (Compl. ¶¶12–13).  The following is a summary of the facts as stated in the complaint.  To the extent that additional facts were developed through discovery, and included in the summary judgment motion, I will discuss them during my analysis of the pending claims.

### A.    Medical Care

#### 1.    Mental Health Treatment

While in custody at HCJ, plaintiff "filed several sick call request[s] to see mental health due to plaintiff's history of PTSD, regarding anxieties, reoccurring nightmares, and depression."  (*Id.* ¶16(a)).  "These requests went unanswered."  (*Id.*).  Plaintiff filed a grievance on April 27, 2017, presumably with respect to his unanswered sick call requests.  (*Id.* ¶16(b)).  The grievance was "returned and signed" on April 28, 2017, by non-party HCJ Lieutenant Coddington, advising plaintiff that medical issues were not "grievable."  (*Id.* ¶16(c)).

#### 2.    Knee Injury

On August 26, 2017, plaintiff was instructed to clean the showers at HCJ.  (*Id.* ¶16(d)).  In the course of doing so, plaintiff "slipped and fell, injuring his right knee."  (*Id.*).  Non-party HCJ Nurse Urtz examined plaintiff's knee and provided him with an ice pack and a cane.  (*Id.*).  Plaintiff requested a knee brace, but was "told by medical that they did not have that medical device in stock."  (*Id.* ¶16(e)).  Plaintiff's mother

3

was authorized to purchase a knee brace for plaintiff to use at HCJ. (*Id.*). Plaintiff was eventually taken to the emergency room, and has had ongoing knee pain since. (*Id.* ¶16(f)).

### 3.   Kidney Condition

Plaintiff alleges that "medical staff knew that plaintiff had kidney problems . . . [including] one functioning kidney, which was borderline renal failure." (*Id.* ¶16(g)). Plaintiff was taken for monthly blood work to check on his kidney function, and was also treated by an outside nephrologist. (*Id.*).

In February 2018, plaintiff "had blood in his urine." (*Id.* ¶16(h)). A subsequent test conducted the following day showed blood "still in [his] urine." (*Id.*). Plaintiff "pleaded" to be taken to the emergency room, but his request was denied because there was no transport officer available. (*Id.*). After waiting five days, plaintiff was "finally" taken to the emergency room. (*Id.* ¶16(i)). Plaintiff was informed that he had passed a kidney stone, and the emergency room physician "explained what a kidney stone could do to an already damaged kidney." (*Id.*). The physician also stated that the kidney stone could have been "broken up" to prevent further damage to plaintiff's kidneys, had it been found earlier. (*Id.*).

On July 13, 2018, plaintiff underwent a CT scan which showed "scarring of the right kidney." (*Id.* ¶16(j)). His nephrologist stated that this was consistent with damage from a kidney stone. (*Id.*).

### 4.    Staph Infection/Bed Bug Bites

On December 13, 2017, plaintiff "noticed a red circle on his left ankle." (*Id.* ¶16(m)). Non-party HCJ Nurse Practitioners Char Macri and Deninno examined plaintiff and concluded that he had an ingrown hair. (*Id.*). Plaintiff's ankle was examined by a visiting facility physician on December 22, 2017, who alternatively diagnosed plaintiff with a staph infection, and prescribed him antibiotics. (*Id.* ¶16(n)). The physician informed plaintiff that he was "lucky [the infection] didn't spread and become drug resistant," and that "plaintiff should've been seen sooner." (*Id.*).

In January 2018, plaintiff submitted a sick call slip concerning "a severe case of bite marks on plaintiff's stomach, back, and head[.]" (*Id.* ¶16(o)). Plaintiff was seen by a nurse who "immediately determined that the bite marks were from bed bugs[.]" (*Id.* ¶16(p)). The nurse commented that HCJ was "infested with them," and that plaintiff could change his cell location. (*Id.*). He was not provided treatment for the bites or itching. (*Id.*). Plaintiff asserts that the conditions at the HCJ were "deplorable" and "filthy," as evidenced by an "infestation of bed bugs throughout" the facility. (*Id.* ¶17).

### B.    Access to Legal Resources

Plaintiff and the rest of the general population at HCJ were "not allowed to contact their lawyers during law library visits based upon a policy of the HCJ legal coordinator," non-party John Korce. (*Id.* ¶16(k)). Korce also denied access to the legal research kiosk and other legal supplies if he was "mad or upset with a particular detainee." (*Id.*).

### C.    HCJ Grievance Procedure

Plaintiff alleges, generally, that the "[grievance] system at HCJ is broken." (*Id.* ¶16(l)). He asserts that while grievances involving "minor issues" will be answered, "anything serious" requires an inmate to keep submitting grievances "continuously." (*Id.*).

### D.    Sexual Assault

On December 25, 2017 at approximately 7 p.m., defendant correctional officer ("C.O.") Andrew Sheppard "ordered [certain inmates, including plaintiff,] to grab the wall," in order to conduct a search prior to transporting the inmates to church services. (*Id.* ¶18). Plaintiff immediately asked defendant C.O. Adrienne Aiello if she would conduct the pat search instead of C.O. Sheppard, due to the fact that C.O. Sheppard, who was "new," "constantly made homosexual comments, that he passed of[f] as jokes," to plaintiff and other inmates. (*Id.* ¶19). C.O. Aiello replied that "this was [C.O. Sheppard's] thing," and denied plaintiff's request. (*Id.* ¶20). C.O. Sheppard proceeded to conduct a pat search of the inmates, "with [C.O.] Aiello standing nearby observing." (*Id.* ¶21). When he got to plaintiff, C.O. Sheppard "began squeezing [plaintiff's] right buttocks repeatedly, while at the same time rubbing [plaintiff's] chest from behind." (*Id.* ¶22). Plaintiff "stiffen[ed]" and looked directly at C.O. Aiello, who "put her hand over her mouth and turned away from what was happening." (*Id.*). C.O. Aiello then stated to C.O. Sheppard, "are you going to at least buy him dinner afterwards[?]" (*Id.*).

After the church service, plaintiff was returned to his cell block. (*Id.* ¶23).

There, plaintiff informed non-party C.O. Minosh "what had happened." (*Id.*). C.O. Minosh "immediately went downstairs and informed [non-party] Sergeant Harrod" of plaintiff's complaint. (*Id.*). Sergeant Harrod came to plaintiff's cell, and directed plaintiff to write to non-party Captain McGrail. (*Id.* ¶24). Plaintiff "immediately wrote to Captain McGrail and gave [the correspondence] to C.O. Minosh to deliver to Captain McGrail's mailbox[,] per Sergeant Harrod's instructions." (*Id.*). Plaintiff never received a reply from Captain McGrail, and "nothing was done." (*Id.* ¶25).

## DISCUSSION

## III.  **Defendant C.O. Jonathan Hadden**

C.O. Hadden is identified as a defendant in one of the introductory paragraphs of plaintiff's complaint. (Compl. ¶3). C.O. Hadden is not, however, listed as a defendant in the plaintiff's state summons (*Id.* at CM/ECF p. 1), nor in the Request for Judicial Intervention (*Id.* at CM/ECF p. 15). Moreover, C.O. Hadden is not referenced in the body of plaintiff's complaint, relative to any of the factual allegations. (*See id.*, generally). Accordingly, defendants argue that the complaint should be dismissed as against C.O. Hadden for lack of his personal involvement in any of the alleged constitutional violations. (Defendants' Memorandum of Law ("Def.'s MOL") at 28) (Dkt. No. 55-22). In his response to the summary judgment motion, plaintiff has requested that C.O. Hadden be dismissed from this action. (Plaintiff's Opposition to SJM ("Pl.'s Opposition") at CM/ECF p. 3) (Dkt. No. 69). In light of the plaintiff's request for a voluntary dismissal, and in the absence of any factual allegations alleging C.O. Hadden's personal involvement in the underlying causes of action, this court

recommends that the complaint be dismissed as against C.O. Hadden.

## IV.  **Exhaustion of Administrative Remedies**

### A.    **Legal Standards**

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements.  *See, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules.  *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)).  In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing

8

suit in federal court.  548 U.S. at 90-103.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies.  *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)).  The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement.  *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, 578 U.S. 632, 136 S. Ct. 1850, 1857 (June 6, 2016).  "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. Sept. 1, 2016) (quoting *Ross*, 578 U.S. at __, 136 S. Ct. at 1857).  Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still relevant.  The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability.  *Ross*, 578 U.S. at __, 136 S. Ct. at 1858.  Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles*, 656 F. App'x at 580.  An administrative procedure is "unavailable" when

> (1) "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, 578 U.S. at __, 136 S. Ct. at 1859-60.

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Id*. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

## B.    Application

The defendants argue that plaintiff failed to exhaust his administrative remedies with respect to claims regarding the allegedly deficient medical care he received at HCJ. (Def.'s MOL at 33). Through their papers, the defendants have established "that a grievance process exist[ed] and applie[d] to the underlying dispute." *Hubbs v. Suffolk County Sheriff's Dept.*, 788 F.3d 54, 59 (2d Cir. 2015) (citation omitted). (Def.'s SJM Exs. E "HCJ Grievance Policy;" F "Inmate Handbook"). Defendants have also submitted as evidence a redacted copy of plaintiff's grievance log, as further proof that plaintiff failed to file any grievances with respect to medical care during his confinement at HCJ. (Def.'s SJM Ex. D "Grievance Log"). In light of the

aforementioned, the burden of production accordingly shifts to plaintiff, compelling him to present evidence that one of the exceptions to the administrative exhaustion requirement applies, excusing his failure to exhaust and permitting his claim to survive summary judgment. *Id.*

Plaintiff testified that he received a rule book upon his transfer into HCJ, through which he became familiar with the facility's grievance process. (50-H Transcript at CM/ECF pp. 20–26) (Dkt. No. 55-7). However, plaintiff maintains that he was consistently told by HCJ staff that medical issues were "not grievable." (50-H Transcript at CM/ECF p. 35; Def.'s SJM Ex. K "Notice to Admit" at CM/ECF pp. 30, 33–34; Plaintiff's EBT Transcript at CM/ECF pp. 9–10, Dkt. No. 55-8). Plaintiff also maintains that the grievance process at HCJ was only "available" to the extent an inmate had to inform an HCJ correctional officer about the subject of his or her grievance, before the correctional officer would "decided whether or not to give [the inmate] a grievance form" to fill out. (Notice to Admit at CM/ECF pp. 35–36). When plaintiff requested grievance forms for medical issues, he was "denied" a form and told the issue "was not grievable." (Plaintiff's EBT Transcript at CM/ECF pp. 9–10).

"When questions of fact and issues of credibility exist regarding the failure to exhaust administrative remedies, a court should neither engage in fact finding nor make determinations as to credibility in addressing a defendant's motion for summary judgment for failure to exhaust." *Curtis v. Bola*, No. 9:15-CV-00718 (GLS/TWD), 2016 WL 7735755, at *9 (N.D.N.Y. Nov. 1, 2016), *report and recommendation adopted*, 2017 WL 120945 (N.D.N.Y. Jan. 12, 2017) (listing cases). In this case, there

is, arguably, an existing question of fact as to whether the conduct of HCJ staff, as alleged by plaintiff, so precluded him from filing grievances about his medical issues as to render them "unavailable" pursuant to *Ross*. However, because the court is recommending dismissal of plaintiff's claims surrounding his medical care based on the merits of those claims, as further discussed below, there is no need for an evidentiary hearing on the issue of exhaustion.

## V.    <u>Municipal Liability - County of Herkimer</u>

### A.    <u>Legal Standards</u>

A municipality may only be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. A municipality may not be held liable solely because it employs a tortfeasor. *LaVertu v. Town of Huntington*, No. 13-CV-4378, 2014 WL 2475566, at *3 (E.D.N.Y. Apr. 4, 2014) (citing inter alia *Los Angeles County, Cal. v. Humphries*, __ U.S. __, 131 S. Ct. 447, 452 (2010)), *report recommendation adopted in relevant part*, 2014 WL 2506217 (E.D.N.Y. June 2, 2014). Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Monell*, 436 U.S. at 694.

"The existence of a municipal policy that gives rise to *Monell* liability can be established in four ways: (1) a formal policy endorsed by the municipality; (2) actions directed by the government's 'authorized decisionmakers' or 'those who establish governmental policy;' (3) a persistent and widespread practice that amounts to a custom

of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees[.]"  *Deferio v. City of Syracuse*, 770 F. App'x 587, 590 (2d Cir. 2019)(cleaned up).  "Once a plaintiff has demonstrated the existence of a municipal policy, a plaintiff must then establish a causal connection, or an 'affirmative link,' between the policy and the deprivation of his constitutional rights. *Id.* (citing *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)); *see also Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (holding that plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged").

A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985)) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell* ").  To satisfy the statute, the municipality's "failure to train its employees in a relevant respect must amount to "'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)).  "Only then 'can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.'" *Id.* (quoting *Canton*, 489 U.S. at 389).

## B.    Application

Plaintiff alleges injury as the result of a multitude of constitutional violations having occurred at HCJ.  The majority of plaintiff's claims attempt to assert liability not on any individual actors operating within the HCJ, but instead on the defendant County of Herkimer (the "County").[1]  The defendants have devoted the majority of their motion papers, and the evidence attached thereto, to arguing the merits of plaintiff's § 1983 claims, asserting that plaintiff has failed to raise a triable issue of fact with respect to medical indifference, access to courts, conditions of confinement, and sexual abuse. (Def.'s MOL at 5–26, 27–31).  However, the defendants also argue that liability cannot attach to the County defendant for any of the asserted constitutional violations under *Monell.*  (*Id.* at 26–27).  For the following reasons, this court agrees that plaintiff's complaint should be dismissed as against the County.

With respect to plaintiff's medical care claims, plaintiff alleges that the County "created or allowed an unwritten practice to continue within its jail by allowing the detainees in their care to be denied proper medical treatment for serious [ ] medical needs[.]" (*Id.* ¶28).  "To prove the third *Monell* kind of liability—custom or usage—the plaintiff must establish a longstanding practice or custom which constitutes standard operating procedure."  *Gleeson v. Cty. of Nassau*, No. 15-CV-6487, 2019 WL 4754326, at *15 (E.D.N.Y. Sept. 30, 2019) (citing *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989)). "The policy must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.' " *Id.* (quoting *Byvalets v. NYC Housing*

---

[1]Plaintiff's sexual abuse and failure to intervene claims being the exception.

*Authority*, No. 16-CV-6785, 2017 WL 7793638, at *16 (E.D.N.Y. July 28, 2017)); *see also Board of County Comm'rs. v. Brown*, 520 U.S. 397, 404 (1997) (The relevant custom must be "so widespread as to have the force of law.").

In this case, plaintiff concedes that HCJ provided him with medical care to some extent, namely for his mental health conditions, kidney issues, knee injury, and bed bug bites/staph infection. At the outset, the court seriously questions whether most of plaintiff's claims of constitutionally deficient medical care would have survived, had they been brought against the HCJ medical staff personally involved in his care. *See Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) ("Unless a plaintiff shows that he has been the victim of a federal law tort committed by persons for whose conduct the municipality can be responsible, there is no basis for holding the municipality liable. *Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy."); *LeClair v. Raymond*, No. 1:19-CV-0028(BKS/DJS), 2020 WL 5027278, at *13 (N.D.N.Y. Aug. 25, 2020) (quoting *Aquino v. City of New York*, No. 16-CV-1577, 2017 WL 2223921, at *1 (S.D.N.Y. May 19, 2017) ("It is well-established that a plaintiff must prove the denial of a constitutional right by a municipal officer in order to hold a municipality liable under *Monell*.").[2]

---

[2]*But see Van Hoven v. City of New York*, No. 16-CV-2080, 2018 WL 5914858, at *8 (S.D.N.Y. Aug. 21, 2018), *report and recommendation adopted*, 2018 WL 4417842 (S.D.N.Y. Sept. 17, 2018) ("*Monell* carries with it no prerequisite that individual liability be established before the municipality can be held responsible for a Section 1983 violation; indeed, a plaintiff may proceed on a *Monell* claim without even naming any individual actors as defendants."); *Barrett v. Orange Cty. Human Rights Comm'n*, 194 F.3d 341, 350 (2d Cir. 1999) (holding that district court erred, as a matter of law, in instructing jury that the liability of the municipal defendants was contingent upon the liability of the individual defendants, and finding that County Human Rights Commission as a whole could have

However, even assuming that plaintiff could establish some unconstitutional conduct, a section 1983 claim against a municipality for the existence of a policy, custom or practice cannot be sustained "by inference solely from evidence of the occurrence of the incident in question." *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986); *see also Ricciuti v. New York City Transit Auth*., 941 F.2d 119, 123 (2d Cir. 1991) (a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy). Here, plaintiff appears to infer a municipal custom of providing deficient medical care solely on the basis of his isolated personal experiences, which would vitiate his claim for municipal liability even if his constitutional rights had been violated. Indeed, plaintiff has not produced evidence of, much less referenced, any other inmate's experience of deficient medical care at HCJ.

Moreover, plaintiff's conclusory allegations of a custom or policy sustained by the County with respect to medical care, without more, do not suffice to establish the County's liability. Specifically, plaintiff claims that the general act he alleges the County has engaged in – allowing pretrial detainees to be denied adequate medical care – is the actionable custom or policy. However, plaintiff has not proffered evidence of an "affirmative link" between this alleged custom and constitutional violations he was subject to. *See Mayes v. Village of Hoosick Falls,* 162 F. Supp. 3d 67, 96 n. 12 (N.D.N.Y. 2016) ("Plaintiffs do not specify or produce evidence of any failure to train or inappropriate policy leading to any particular unconstitutional conduct and thus

_____

violated the plaintiff's constitutional rights, even if individual Commission members did not).

16

cannot make out a direct causal link between the alleged municipal failing and any constitutional deprivation."); *see also Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993) (affirming dismissal of complaint where the *Monell* allegations "contained only conclusory and speculative assertions" that the alleged conduct occurred "pursuant to the practice, custom, policy and particular direction of" the policymaker) (quotation marks omitted); *Bradley v. City of New York*, No. 08-CV-1106, 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) ("The Complaint's conclusory, boilerplate language . . . is insufficient to raise an inference of the existence of a custom or policy, let alone that such a policy caused" the plaintiff's injuries). Plaintiff has failed to advance any specific policies or allegations other than those generally asserted in his complaint relative to the County's overall provision of medical care at HCJ, despite the opportunity for further discovery. Accordingly, plaintiff's claim against the County with respect to this issue should be dismissed.

Plaintiff further asserts that the County "knew or should have known through reports/complaints that the grievance system [at HCJ] was broken," and that grievances were "systematically not being answered[.]" (*Id.* ¶29). However, it is "well established that a prison inmate has no constitutional right of access to an internal grievance process." *Johnson v. Cty. of Saratoga*, No. 9:18-CV-0096 (DNH/DEP), 2018 WL 10910777, at *9 (N.D.N.Y. Apr. 16, 2018); *see also Rhodes v. Hoy,* No. 05-CV-0836, 2007 WL 1343649, at *6 (N.D.N.Y. May 5, 2007) (noting that inmates have "no constitutional right of access to the established inmate grievance program"). The same applies to the plaintiff here, notwithstanding his status as a pretrial detainee. *See Bell v.*

*Beebe,* No. 9:06–CV–544 (NAM/GJD), 2007 WL 1879767, at *4 (N.D.N.Y. June 29, 2007) (violation of state inmate grievance procedures "does not give rise to a claim under section 1983, under the due process clause or otherwise"); *Johnson v. New York City Dep't of Health,* No. 06 Civ. 13699, 2008 WL 5378124, at *3 (S.D.N.Y. Dec. 22, 2008) (pretrial detainee's allegations that inmate medical complaints were knowingly excluded from the institutional grievance process did not state a constitutional claim). Thus, given the absence of an underlying constitutional violation, plaintiff's allegations against the County with respect to the "broken" grievance system at HCJ cannot state a claim under *Monell. See, e.g., Schultz v. Inc. Vill. of Bellport*, 479 Fed. App'x 358, 360 (2d Cir. 2012) ("Because [the plaintiff] was unable to establish an underlying violation of his constitutional rights . . ., his . . . *Monell* claim necessarily fail[s] as well.").

Plaintiff has also raised a claim of unconstitutional conditions of confinement against the County, claiming that "no exterminator was called to eradicate" the bed bugs that caused "bite marks throughout his body."  (*Id.* ¶30).  Construing the facts in a light most favorable to the non-moving party, plaintiff has established an isolated, one time incident in December 2017, wherein he was assessed to have suffered "scattered bug bites" on his body.  The undisputed record reflects that upon discovering plaintiff's bites, HCJ staff moved him to a different cell, disinfected his mattress, and replaced his sheets.  (Compl. ¶¶16(o)-(p); Defendants' SJM Ex. I at CM/ECF p. 5, Dkt. No. 55-16).  There is no evidence outside of plaintiff's conclusory allegation suggesting that HCJ had an ongoing bug infestation issue, that any other inmate at HCJ suffered from similar bug bites, or that an alleged "infestation" was brought to the attention of, or

18

should have been known by, the County defendant.

On these facts, plaintiff cannot sustain a claim based on his allegations of the County's consistent and widespread practice of allowing bug infestations at HCJ, where he is relying "on his own experiences and then extrapolating to the entire jail population." *Rutherford v. Westchester Cty.*, No. 18-CV-4872, 2020 WL 433841, at *12 (S.D.N.Y. Jan. 28, 2020). This, combined with the absence of any "factual indicia from which this court could infer the existence of a policy or custom," proves fatal to plaintiff's claim against the County with respect to the conditions of his confinement. *Mercedes v. Westchester County*, No. 18-CV-4087, 2019 WL 1429566, at *5 (S.D.N.Y. Mar. 29, 2019) (dismissing *Monell* claim alleging that the plaintiff was served unhygienic and inedible food where the plaintiff did not allege "the existence of any policy, any actions taken or decisions made by . . . policymaking officials" . . . or any "factual indicia from which this Court could infer the existence of a policy or custom"); *see also Figueroa v. Cty. of Rockland*, No. 16-CV-6519, 2018 WL 3315735, at *9 (S.D.N.Y. July 5, 2018) (dismissing pretrial detainee's *Monell* claim alleging unsanitary conditions of confinement where complaint contained allegations of a "single incident," without "a single allegation tying any of the alleged unlawful conduct to an overarching policy or custom.").

Although the plaintiff does not list any specific causes of action against the County for his purportedly restricted access to legal materials and communication, the court assumes for purposes of this motion that those claims are also intended to be asserted against the County, considering the absence of any other named defendant who

appears to be even remotely connected to those allegations.  Nevertheless, plaintiff has failed to establish a *Monell* claim under any of the available theories.  There is no allegation, or evidence, to suggest that the County acted pursuant to a formal municipal policy, or an informal custom or practice, with respect to the alleged difficulty plaintiff experienced accessing legal resources at HCJ.  Nor has plaintiff advanced any evidence that similar deprivations occurred as to other inmates. Plaintiff merely alleges that the demand for the only available legal research kiosk was so great among the inmates that he often did not get a turn to use it on his visits to the law library, and that the other legal resources available to him were "old."  (Plaintiff EBT Transcript at CM/ECF pp. 12–14).  Plaintiff also testified to an incident wherein the HCJ law library coordinator refused to allow plaintiff to pay for printouts relevant to plaintiff's legal research.  (50-H Transcript at CM/ECF pp. 51–52).  However, plaintiff concedes that he had been permitted to pay for and retain printouts from the law library "multiple times in the past" – thus indicating that the challenged conduct at issue was not a policy promulgated by the County, but merely the isolated actions of an individual correctional officer.  (*Id.*).

Furthermore, plaintiff has not provided any evidence of the training provided to HCJ staff employed in the law library, or advanced any theory as to how a training deficiency by the County prevented him from sufficiently accessing necessary legal resources.  *See Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 130 (2d Cir. 2004) ("It is impossible to prevail on a claim that the Town's training program was inadequate without any evidence as to whether the Town trained its officers between the two

demonstrations, how the training was conducted, how better or different training could have prevented the challenged conduct, or how 'a hypothetically well-trained officer would have acted under the circumstances' to remove passively resisting protesters."). For these reasons, plaintiff's claim against the County further fails.

Purportedly referring to the alleged  incident of sexual abuse by C.O. Sheppard, and C.O. Aiello's failure to intervene, plaintiff attempts to attribute fault to the County by alleging that, "through its policies, customs [written and/or unwritten], practices, usage, [the County] failed to properly train its staff when coming into contact with its detainees."  (Compl. ¶27). At the outset, plaintiff's claim based on an alleged failure to train once again fails because plaintiff does not "identify a specific deficiency in the [county's] training program and establish that that deficiency is closely related to [plaintiff's] ultimate injury, such that it actually caused [his] constitutional deprivation." *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006).  Moreover, for the reasons discussed below this court is recommending that plaintiff's claims against C.O. Sheppard and C.O. Aiello be dismissed for failure to raise a question of material fact sufficient to survive summary judgment.  Accordingly, plaintiff cannot sustain a claim against the County based on the conduct of C.O. Sheppard and C.O. Aiello, in the absence of any constitutional deprivation therein.

## VI.  Sexual Assault/Failure to Intervene

### A.    Legal Standards

#### 1.    Sexual Assault

In *Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015), the Second Circuit explained that an inmate pursuing a sexual abuse claim under the Eighth Amendment must allege both subjective and objective elements, namely that the "officer's intentional contact with an inmate's genitalia or other intimate area . . . serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate[.]" 796 F.3d at 257. The "principal inquiry" a court must make "is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is taken to arouse or gratify the officer or humiliate the inmate." *Id*. at 257–58.

A pretrial detainee's claim of sexual abuse against a correctional officer is governed by the due process clause of the Fourteenth Amendment, and not by the Eighth Amendment, as "pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (internal quotation marks, citations, and alterations omitted).  However, courts in this Circuit have noted that it is not yet clear whether a pretrial detainee's sexual abuse claim under the Fourteenth Amendment—as opposed to an excessive force claim— is subject to an objective or subjective *mens rea* requirement.  *See, e.g., Lewis v. Huebner*, No. 17 Civ. 8101, 2020 WL 1244254, at *9 (S.D.N.Y. Mar. 16, 2020) ("[I]t is presently unclear whether both

prongs required for Eighth Amendment sexual abuse claims are also required for claims of sexual abuse under the Fourteenth Amendment." (citation and internal quotation marks omitted)); *Gilliam v. Black*, No. 18 Civ. 1740, 2019 WL 3716545, at *10 (D. Conn. Aug. 7, 2019) ("[T]he Supreme Court has ruled in *Kingsley* that only an objective standard is appropriate when analyzing claims of excessive force brought by pre-trial detainees, it is unclear to what extent this ruling is applicable to a pretrial detainee's claims of sexual abuse under the Fourteenth Amendment."). In general, protections under the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Darnell*, 849 F.3d at 29 (citation and quotation marks omitted).

## 2. Failure to Intervene

When a pretrial detainee plaintiff brings § 1983 claims alleging failure to protect or intervene, the plaintiff must satisfy a two-prong test by showing: "(1) he is incarcerated under conditions posing a substantial risk of serious harm . . . and (2) the defendant-official acted intentionally . . . or recklessly failed to act with reasonable care to mitigate the risk . . . even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Barnes v. Harling*, 368 F. Supp. 3d 573, 596 (W.D.N.Y. 2019) (internal citations and quotations omitted) (citing inter alia *Darnell v. Pineiro*, 849 F.3d 17, 30, 35 (2d Cir. 2017)); *see, e.g.*, *Taylor v. City of New York*, No. 16 Civ. 7857, 2018 WL 1737626, at *11 (S.D.N.Y. Mar. 27, 2018) ("Although *Darnell* involved a Fourteenth Amendment challenge to a prisoner's conditions of confinement, its holding applies with equal measure to failure

to protect claims."); *Molina v. County of Westchester*, No. 16-CV-3421, 2017 WL 1609021, at \*2–3 (S.D.N.Y. Apr. 28, 2017) (applying the deliberate indifference standard articulated in *Darnell* to a failure to protect claim).

### B.    Application

In his complaint, plaintiff alleges that he was sexually abused during a pat search at HCJ when C.O. Sheppard "intentionally squeezed plaintiff's right buttocks while rubbing plaintiff's chest simultaneously, making low sounds, as if he were 'getting off.'" (Compl. ¶34). Plaintiff also asserts that C.O. Aiello is culpable for observing C.O. Sheppard's conduct, and failing to intervene and stop the sexual abuse. (*Id.* ¶37).

The facts as asserted by plaintiff were further developed throughout the course of discovery. At his 50-H hearing, plaintiff testified that C.O. Sheppard made him feel "uncomfortable" during his confinement at HCJ. (50-H Transcript at CM/ECF p. 41) (Dkt. No. 55-7). Plaintiff elaborated that C.O. Sheppard made "homosexual" jokes directed at the inmates. (*Id.*). With respect to the subject pat search, plaintiff testified that on December 25, 2017, C.O. Sheppard approached the inmates waiting to be searched before attending church services, and instructed them to put their hands on the wall and spread their legs. (*Id.* at CM/ECF p. 44). Plaintiff and the other inmates complied. (*Id.* at CM/ECF pp. 44–45). Plaintiff testified that the purpose of the search was to ensure that the inmates did not have contraband in their possession. (*Id.* at CM/ECF p. 45). Plaintiff was the third inmate to be patted down by C.O. Sheppard. (*Id.* at CM/ECF p. 46). Plaintiff testified that during the pat search, C.O. Sheppard squeezed and grabbed plaintiff's right buttocks for between five and ten seconds. (*Id.*).

C.O. Sheppard also "wrapped his arm around [plaintiff] and rubbed [his] chest from behind," with one hand, for approximately ten to fifteen seconds. (Defendants' Reply Declaration Ex. N at CM/ECF pp. 4–5, 6) (Dkt. No. 72-1). Plaintiff testified that C.O. Sheppard did not say anything to him during the pat search. (50-H Transcript at CM/ECF p. 47). Plaintiff did not say anything to C.O. Sheppard, as he was "stunned, shocked, [and] nervous." (*Id.*). C.O. Sheppard proceeded to search the rest of the inmates. (*Id.*). At this time, C.O. Aiello was positioned at the end of the hall. (*Id.* at CM/ECF p. 49). Plaintiff did not hear C.O. Aiello say anything during the pat search conducted by C.O. Sheppard. (*Id.*). Another inmate later told plaintiff that C.O. Sheppard had performed the same act on him during the pat search, however plaintiff did not observe this. (*Id.* at CM/ECF pp. 48–49).

Plaintiff provided further testimony at his examination before trial. There, he testified that prior to December 25, 2017, other correctional officers had come in contact with his chest during the course of routine pat searches. (Plaintiff's EBT Transcript at CM/ECF pp. 18–19). Plaintiff also testified that other correctional officers had grazed the outside of his buttocks during prior, routine pat searches. (*Id.* at CM/ECF p. 20).

Defendants dispute that plaintiff was subject to sexual abuse during the pat search conducted by C.O. Sheppard. In support of their motion, defendants have submitted C.O. Sheppard's sworn declaration describing the underlying incident. (Declaration of Andrew Sheppard ("Sheppard Decl.")) (Dkt. No. 55-5). C.O. Sheppard began working as a correctional officer at HCJ in the fall of 2017, and was apparently

working there on a part-time basis at the time of the underlying incident, while
simultaneously attending the New York State Police Academy. (Sheppard Decl. ¶3).
Before working independently as a correctional officer at the HCJ, however, C.O.
Sheppard was required to, and did, complete an on-the-job training program. (*Id.*). On
December 25, 2017, C.O. Sheppard and non-party C.O. Minosh were summoned from
the booking office at HCJ to transport a group of three inmates, one of which was
plaintiff, to the recreation room on the second floor. (*Id.* ¶8). It was a routine security
practice at HCJ to pat search an inmate when he was transported to or from a group
activity, in order to control and prevent the transfer of contraband. (*Id.*). C.O.
Sheppard performed a pat search of the three inmates under the direct observation of
C.O. Minosh, a more experienced officer, as well as in the view of C.O. Aiello, who
was "at a post down the hallway near the entrance of the recreation room." (*Id.*). He
conducted the pat search in the same manner he had conducted all pat searches of
inmates since his initial training, which included the following sequence:

> having the inmate face the wall; have the inmate place their hands
> on the wall and spread their legs; start pat down process at the
> shirt collar and work [his] way down patting the inmate with both
> hands paying particular attention to the collar, waistband and
> front pocket looking for potential contraband; and finish the pat
> down at the inmate's feet and pant legs before instructing them to
> put their shoes back on.

(*Id.*). C.O. Sheppard further avers that "conducting pat searches is always a serious and
unpleasant procedure, so it is not [his] practice to joke around or even speak with the
inmates during such searches unless [he is] giving them further instructions." (*Id.*).
C.O. Sheppard's only purpose for conducting pat searches of the inmates at HCJ was to

comply with security procedures, and he disputes plaintiff's allegations otherwise as "false and ridiculous." (*Id.*). C.O. Sheppard became aware of plaintiff's "false" allegation of sexual abuse within a few days after the fact. (*Id.*). C.O. Sheppard had "very little contact" with plaintiff after December 25, 2017, and he asserts that HCJ administrators "attempted to assign [him] to posts at locations away from plaintiff in order to protect [C.O. Sheppard] from additional false allegations." (*Id.* ¶9).

Defendants have also submitted the sworn declaration of Adrienne Aiello in support of their summary judgment motion. (Declaration of Adrienne Aiello ("Aiello Decl.")) (Dkt. No. 55-4). In December 2017, C.O. Aiello was employed as a correctional officer assigned at the HCJ. (*Id.* ¶1). C.O. Aiello specifically recalls the events of December 25, 2017 because they were subject to an "internal investigation conducted by the Sheriff's Office." (*Id.* ¶7). At the time in issue, C.O. Aiello was assigned to a post in the second floor hallway, from which she could see the hallway and also see into the recreation room. (*Id.*). It was C.O. Aiello's responsibility to observe the inmates in the recreation room, operate the secure door between the rooms and the hallways, and observe activities in the hallway. (*Id.*). It was a routine security practice to subject any inmate transported to or from a group activity to a pat search, in order to control and prevent the transfer of contraband. (*Id.*). In accordance with that security practice, C.O. Aiello observed C.O. Minosh and C.O. Sheppard place three inmates against the wall, one of which was plaintiff. (*Id.*). She then observed C.O. Sheppard conduct a pat search of the three inmates under the supervision of C.O. Minosh, the more senior correctional officer. (*Id.*). C.O. Aiello did not hear anything

that was said to, or by, any of the inmates searched by C.O. Sheppard. (*Id.*). She did not observe anything unusual about the manner or duration of the pat searches completed by C.O. Sheppard. (*Id.*). C.O. Aiello "did not say anything" to the inmates while they were being searched. (*Id.*). She observed the pat search performed by C.O. Sheppard of plaintiff to be "similar to the hundreds of routine pat searches she had observed by male C.O.s in the HCJ." (*Id.*).

Last, defendants have submitted the declaration of Sheriff Scott Scherer in support of their motion for summary judgment. (Declaration of Sheriff Scott Scherer ("Scherer Decl.")) (Dkt. No. 55-2). In December 2017, Sheriff Scherer worked as the Undersheriff in the Herkimer County Sheriff's Office. (*Id.* ¶2). There came a time when Sheriff Scherer was made aware of the allegations made by plaintiff against C.O. Sheppard with respect to the subject pat search. (*Id.* ¶12). He discussed the allegations with the then acting Sheriff and Captain, jointly reaching a decision to formally investigate the allegation, considering the nature of the claim and the fact that C.O. Sheppard was new to the HCJ. (*Id.*). After assigning a professional investigator from the criminal division of the Sheriff's Office to conduct an impartial investigation, plaintiff's allegations were deemed to be unfounded. (*Id.*). C.O. Sheppard has "continued to work effectively as a HCJ C.O. since that date." (*Id.*).

Based on the record presently before this court, plaintiff has failed to raise a material question of fact in order to sustain his sexual abuse claim against C.O. Sheppard. At the outset, plaintiff has failed to satisfy the objective prong of his claim, whether assessed under the Eighth or Fourteenth Amendment. *See Horace v. Gibbs*,

802 F. App'x 11, 14 (2d Cir. 2020) ("For both the Eighth and Fourteenth Amendments, the objective prong poses the same standard."); *Bellotto v. Cty. of Orange*, 248 F. App'x 232, 235 (2d Cir. 2007) (citing the "objectively, sufficiently serious" standard and writing that "[w]e apply the same standard of law to excessive force claims brought by pretrial detainees, which arise under the Fourteenth Amendment rather than the Eighth.").  In order to survive summary judgment, plaintiff must establish a material question of fact as to whether C.O. Sheppard acted in a manner objectively "sufficiently severe or serious" to "constitute conduct that was sufficiently harmful enough to offend contemporary standards of decency." *Gilliam*, 2019 WL 3716545, at *10. At most, plaintiff has established that during the course of a routine pat search, which was undisputedly warranted, C.O. Sheppard rubbed plaintiff's chest and squeezed his right buttock for between five to ten seconds.  Despite plaintiff's initial allegations, his subsequent sworn testimony reflects that C.O. Sheppard did not say anything to plaintiff during the encounter.  Plaintiff also concedes that some contact with his chest and buttock is the sort to be expected during a pat search, and which he had experienced to some extent during searches performed by other correctional officers. Even construing the facts in a light most favorable to plaintiff,[3] the events as described by him are "too similar to the type of incidental contact accompanying a run-of-the-mill pat down to reasonably infer any inappropriate touching or malicious intention." *Cole v. Suffolk Cty. Corr. Facility*, No. 20-CV-1883, 2020 WL 2113205, at *4 (E.D.N.Y. May 4, 2020) (dismissing pretrial detainee's sexual assault claim alleging that deputy,

---

[3]C.O. Sheppard denies that he ever came into contact with plaintiff's buttock during the subject pat search.  (Plaintiff's Opp. at CM/ECF p. 22).

while performing a frisk, "grop[ed] my penis and scrotum and then br[ought] his forearm into my scrotum").

Moreover, courts in this district have dismissed sexual abuse claims that alleged either equivalent or more serious conduct than that attributed to C.O. Sheppard in this case, even post-*Crawford*.[4]  *See Hernandez v. Oswinski*, No. 18 CV 7365, 2019 WL 4274377, at *2 (S.D.N.Y. Sept. 10, 2019) (correctional officers alleged to have "tapped" plaintiff on the buttock during one search, and "touched his private parts" during another); *Perez v. Ponte,* 236 F. Supp. 3d 590, 618 (E.D.N.Y. Feb. 14, 2017) (plaintiff alleged that correctional officer put his hand between the plaintiff's buttocks during a strip search and then removed his fingers and told the plaintiff that he "smelled sweet"); *Dozier v. Franco,* No. 17-CV-3348, 2018 WL 3094935, at *3 (S.D.N.Y. June 22, 2018) (while being pat frisked before walking to recreation, correctional officer "squeezed, grabbed, and fondled" plaintiff's "genital area twice"); *Bey v. Griffin,* No. 16 CV 3807, 2017 WL 5991791, at *3 (S.D.N.Y. Dec. 1, 2017) (during pat frisk,

---

[4]Prior to 2015, the standard set forth in *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) governed Eighth Amendment claims arising from sexual abuse in prison. "Although *Boddie* held that inmate sexual abuse could, in principle, violate the Eighth Amendment, it concluded that a 'small number of incidents in which the plaintiff allegedly was verbally harassed, touched, and pressed against without his consent' were insufficient to state a claim." *Crawford v. Cuomo*, 721 Fed. App'x 57, 59 (2d Cir. 2018)(quoting *Boddie*, 105 F.3d at 861). Thus, "the court [in *Boddie*] held that the plaintiff's Eighth Amendment rights were not violated where the plaintiff claimed a corrections officer 'made a pass' at him, squeezed [his] hand, touched his penis, called him a 'sexy black devil,' and pressed her breasts to his chest and her vagina to his penis." *Williams v. Cmty. Sols., Inc.*, 932 F. Supp. 2d 323, 330 (D. Conn. 2013) (quoting *Boddie*, 105 F.3d at 859).  However, in 2015 the Second Circuit decided *Crawford*, wherein the court indicated that "while the standard articulated in *Boddie* remains the same, its applicability must change as the basic mores of society change." *Crawford v. Cuomo*, 796 F.3d 252, 260 (2d Cir. 2015) (punctuation omitted). "Accordingly, conduct that might not have been seen to rise to the severity of an Eighth Amendment violation 18 years ago may now violate community standards of decency, and for that reason" the Second Circuit surmised that the officers' conduct in *Boddie* would flunk its own test today. *Id.*

correctional officer's hands were "in [plaintiff's] pants," and that he felt him "up in down" and touched his "private parts").

There is, furthermore, no evidence that plaintiff suffered injuries from the pat search, other than his conclusory allegation that he was "humiliated" and "shamed" by C.O. Sheppard, and suffers "mental anxiety" as a result.  (Compl. ¶36).  *See Washington v. Fitzpatrick*, No. 20 CV 911, 2021 WL 966085, at *4 (S.D.N.Y. Mar. 15, 2021) (plaintiff failed to satisfy objective prong of sexual abuse claim where no physical injuries were sustained and plaintiff offered "no factual allegations to suggest that [the] pat frisk was not 'incidental to legitimate official duties'").  Accordingly, plaintiff has not adduced sufficient evidence that C.O. Sheppard's conduct was sufficiently harmful enough to offend contemporary standards of decency in order to satisfy the objective prong of his sexual abuse claim. *See Crawford v. Cuomo*, 796 F.3d at 256 (To state a claim for sexual abuse, an inmate plaintiff "must allege that the conduct was objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions.").

With respect to the mens rea prong of plaintiff's sexual abuse claim, plaintiff has not advanced more than conclusory evidence of overtly sexual comments or conduct from which this court could adduce that C.O. Sheppard acted with an intent to gratify his own sexual desire, or to humiliate plaintiff.  In an effort to overcome summary judgment, plaintiff has produced the voluntary statement of C.O. Sheppard, which was apparently prepared by the Herkimer County Sheriff's Office in conjunction with its internal investigation of plaintiff's allegations of sexual abuse.  (Pl.'s Opposition Ex. A

at CM/ECF p. 22) (Dkt. No. 69-1).  C.O. Sheppard's description of the pat search in his

voluntary statement generally aligns with that contained in the declaration he has since

submitted in support of the defendants' motion. However, in his voluntary statement to

the Sheriff's Office, C.O. Sheppard additionally asserts:

> As far as comments made regarding sexual acts, I have made
> comments, both to inmates and C.O.s, in joking manners in the
> past.  This is something that does occur as people are standing
> around joking.  I may have made comments to [plaintiff] in the
> past, but don't recall specific comments made to him.

(*Id.*).

Although not in direct conflict with his sworn declaration prepared for purposes

of the pending motion, C.O. Sheppard's admission casts some doubt on his purported

aversion to "joking around" with inmates during pat searches.[5]  (Sheppard Decl. ¶8).

Notwithstanding, C.O. Sheppard's remote history of making sexually charged jokes to

the plaintiff and other inmates on prior, separate occasions, however reprehensible

considering his position of authority, does not suffice to create a material question of

fact as to his intentions during the subject pat search of plaintiff.  In his complaint,

plaintiff alleges that C.O. Sheppard was making "low sounds" during the pat search,

from which plaintiff extrapolated that C.O. Sheppard was obtaining some sexual

gratification from the incident.  However, in his subsequent, sworn testimony, plaintiff

conceded that C.O. Sheppard did not speak to him at all during the search.  *See Medina*

*v. Angrignon*, No. 15-CV-427-A, 2021 WL 1817046, at *7 (W.D.N.Y. May 6, 2021)

---

[5]As does the statement of C.O. Sheppard's coworker, who apparently made comments to
plaintiff, such as "do you want [C.O.] Sheppard to cuddle with you," as a "joke," within days after the
subject pat search.  (Pl.'s Opposition at CM/ECF p. 23).

(quoting *Thomas v. Westchester Cty. Health Care Corp.*, 232 F. Supp. 2d 273, 279 (S.D.N.Y. 2002) ("Faced with [a] confounding contradiction [between plaintiff's allegations in her complaint and her sworn testimony], the Court has no basis for accepting as true the vague statements in [the] [c]omplaint as opposed to [plaintiff's] sworn testimony . . . . "). There is no other evidence before this court of any overtly sexual actions or comments contemporaneously made by C.O. Sheppard.

Moreover, the parties do not dispute that C.O. Sheppard had a legitimate, penological basis for conducting the pat search of plaintiff before he was transported to another area within the HCJ.  Thus, the court finds that plaintiff has adduced only conclusory allegations that, based on prior inappropriate comments made by C.O. Sheppard, and the discomfort plaintiff felt around him, C.O. Sheppard obtained some sexual gratification from the December 25, 2017 pat search.  *See Grant v. Norfleett*, No. 17-CV-328, 2017 WL 1902150, at *3 (D. Conn. May 9, 2017) ("[T]he Complaint includes only a conclusory allegation that the defendants conducted the search for their own sexual gratification, and an assertion that on occasions after the plaintiff was strip searched, the defendants 'watched him like a piece of meat.' "); *Lewis v. Huebner*, 2020 WL 1244254, at *9 (pretrial detainee did not meet subjective prong of sexual abuse claim where she did not allege any overtly sexual comments or conduct; "rather, she simply asserts knowledge of [the defendant's] intent and state of mind in conclusory fashion"); *compare Wiley v. Kirkpatrick*, 801 F.3d 51, 56-57, 61, 69-70 (2d Cir. 2015) (vacating district court's order dismissing harassment claim based on allegation that correction officer "lick[ed] his lips" and "bl[ew] kisses" toward plaintiff inmate while

plaintiff was showering).  Accordingly, the court recommends that plaintiff's claim of sexual abuse against C.O. Sheppard be dismissed.

Based on my recommendation that defendants' motion for summary judgment be granted with respect to plaintiff's sexual abuse claim against C.O. Sheppard, "it follows that the claim against [C.O. Aiello] for failure to intervene is moot." *Maxwell v. Miller*, No. 9:16-CV-0275(LEK/DEP), 2018 WL 3095834, at *7 (N.D.N.Y. May 21, 2018), *report and recommendation adopted*, 2018 WL 3069210 (N.D.N.Y. June 21, 2018) (citing *Holland v. City of N.Y.*, 197 F. Supp. 3d 529, 549 (S.D.N.Y. 2016)) (discussing that, if an officer's conduct does not violate a constitutional right, the analysis ends, because failure to intervene claims are contingent upon the underlying claims); *see also Sankara v. Plaskett*, No. 15-CV-8470, 2017 WL 4444250, at *5 (S.D.N.Y. Oct. 4, 2017) ("Failure to intervene claims are contingent upon the disposition of the primary claims underlying the failure to intervene claim.").  Accordingly, because the court finds that plaintiff has not established a constitutional violation against C.O. Sheppard, the claim against C.O. Aiello necessarily fails.[6]

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 55) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY WITH PREJUDICE**.

---

[6]Plaintiff contends that video footage from the "2 North Camera" inside of the HCJ, recorded on December 25, 2017 between 6:35 p.m. and 6:40 p.m., shows that C.O. Aiello was "standing alongside" C.O. Sheppard and observed C.O. Sheppard sexually abuse plaintiff.  The court has had an opportunity to view this video footage, as was submitted by the defendants in their reply papers. (Defendants' Reply Declaration Ex. O) (Dkt. No. 72). The relevant video footage, however, does not depict C.O. Aiello, nor does it capture C.O. Sheppard's pat search of plaintiff in any respect.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 16, 2022

Andrew T. Baxter
U.S. Magistrate Judge